# United States District Court
# Northern District of Indiana
# Hammond Division

JENNIFER RAMSEY,      )
             )
      Plaintiff,   )
             )  Civil Action No. 1:09-CV-233 JVB
      v.     )
             )
MICHAEL ASTRUE,      )
             )
      Defendant.  )

## OPINION AND ORDER

Plaintiff Jennifer Ramsey is appealing the denial of Social Security disability benefits by Administrative Law Judge ("ALJ") Richard Verwiebe. Plaintiff's claim rests on two medical issues: back pain triggered by a 1997 automobile crash, and panic attacks and generalized anxiety that she traces to her childhood. In a pair of decisions, the ALJ found that the objective medical evidence does not support Plaintiff's claim that she was incapable of performing sedentary work beginning in 2002. Instead, ALJ set July 17, 2006, as the onset date of disability.

## A. Procedural Background

On March 22, 2004, Plaintiff applied for Supplemental Security Income, and on April 19, 2004, Plaintiff filed application for Disability Insurance Benefits. (DE 1-2 at 4.) She alleged an onset date of disability of August 23, 2001. (*Id.*) Plaintiff's applications were initially denied, and were denied again upon reconsideration. (*Id.*) Plaintiff filed a request for a hearing before an ALJ on October 12, 2004, and her request was granted. (*Id.*)

A hearing was held on January 22, 2007, before ALJ Richard C. VerWiebe in Fort

Wayne, Indiana. (*Id.*) In a decision dated February 9, 2007, the ALJ held that Plaintiff became disabled on July 17, 2006, and thus was not entitled to Title II Benefits as she was not disabled on or before the date she was last insured, March 31, 2006. (*Id.* at 1–2.)

Plaintiff then filed an appeal with the Appeals Council. (*Id.* at 28.) The Appeals Council directed the ALJ to address again Plaintiff's allegation of disability before July 17, 2006. (*Id.*) The ALJ held a new hearing in December 2007, in which he considered additional medical evidence for the period before July 2006. (*Id.*) At the hearing, Plaintiff amended her onset date of disability from August 23, 2001, to October 15, 2002. (*Id.* at 29.)

At the second hearing, the ALJ again reached a decision that Plaintiff became disabled on July 17, 2006, and thus was not entitled to Title II Benefits. (*Id.*) The ALJ found as follows:

> 1. The claimant met the insured status requirements of the Social Security Act on March 31, 2006.
>
> 2. The claimant had not engaged in substantial gainful activity since October 15, 2002, the amended alleged onset date.
>
> 3. After the amended onset date of disability, the claimant had the following severe impairment: degenerative disc disease (cervical and lumbar).
>
> 4. Since the amended onset date of disability, the claimant had not had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d) and 416.920(d)).
>
> 5. Prior to July 17, 2006, the date the claimant became disabled, the claimant had the residual functional capacity to lift and/or carry ten pounds, sit six hours out of an eight-hour day, and stand and/or walk two hours out of an eight-hour day.
>
> 6. Beginning on July 17, 2006, the claimant had the residual functional capacity to lift and/or carry ten pounds, sit six hours per eight-hour work day, and stand and/or walk two hours per eight-hour work day. She was also limited to simple repetitive tasks that involved no more than occasional contact with the public, co-workers, and supervisors.

7. Since the amended alleged onset date of disability, but not on or after July 17, 2006, the claimant had been able to perform past relevant work.

8. The claimant was born on January 16, 1958 and was forty-four years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date.

9. The claimant had at least a high school education and was able to communicate in English.

10. Beginning on July 17, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were not a significant number of jobs in the national economy that the claimant could perform.

11. The claimant was not disabled prior to July 17, 2006, because she could return to past relevant work; but she became disabled on July 17, 2006, and had continued to be disabled through the date of the decision.

12. The claimant was not under a disability within the meaning of the Social Security Act at any time through March 31, 2006, the date last insured.

(*Id.* at 31-39.)

On October 17, 2008, Plaintiff filed a request for review with the Appeals Council. (*Id.* at 43.) On August 20, 2009, the Appeals Council affirmed the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (*Id.*) Plaintiff filed a complaint in the U.S. District Court for the Northern District of Indiana. (DE 20.)

**B. Factual Background**

**(1) *Preliminary Events***

Plaintiff was born on January 16, 1958, and has a high school education. Her relevant work history began in 1997, when she was employed as a receptionist at a Fort Wayne auto body shop. Besides work as a receptionist, she has also worked as a sales associate at Home Depot and a deputy clerk. (Tr. 88, 90-96, 100, 596-97, 609-10, 620).

**(2)** *Medical Evidence*

(a) *Anxiety/Panic Disorder*

*1989*

      Plaintiff claims anxiety and/or panic disorder dating back to high school, though she says that it was for a long time undiagnosed. When seeking rehabilitation for alcohol abuse and Xanax prescription drug abuse in 1989, Plaintiff said that she often used alcohol as a means to control panic attacks, which began "eight or nine years ago," and occurred at a frequency of three to seven episodes per week.

*1995*

      In July 1995, Plaintiff reported staying home a lot from work because of anxiety symptoms, which were not dissipating with age as she had hoped (Tr. 180).

*1997*

      From 1997 to roughly the beginning of 2003, Plaintiff did not have panic attacks. (DE 1-2 at 31.) She did not seek any mental health treatment from a mental health specialist during this period. (*Id.* at 7.)

*2001*

      Plaintiff quit drinking some time after August 2001. (*Id.* at 9.).

*2004*

In May 2004, psychologist Barbara C. Gelder, Ph.D., held a consultative examination with Plaintiff at which time she determined that Plaintiff had a generalized anxiety disorder and panic attacks. The psychologist, however, did not believe that the disorders interfered with Plaintiff's activities of daily living. (Id. at 31.)

On July 6, 2004, W. Shipley, Ph.D., a reviewing psychologist with the state agency, opined that the evidence did establish a severe mental impairment (Tr. 436-38). Dr. Shipley noted Dr. Gelder's evaluation and observed that Plaintiff got her daughter ready for school; packed her boyfriend's lunch daily, cooked and cleaned; did laundry, yardwork, and housework; had a good relationship with her mother and attended her daughter's school functions; drove and went out alone; and had hobbies including sewing and reading (Tr. 448).

*2006*

On July 17, 2006, Sherwin Kepes, Ph.D., conducted a consultative evaluation of Plaintiff (Tr. 547-50). Plaintiff reported panic attacks about twice a week and difficulty with concentration and focus (Tr. 547). On examination, Dr. Kepes observed that Plaintiff did not exhibit significant problems with cognition or mentation (Tr. 550). Dr. Kepes administered psychological testing (the Minnesota Multiphasic Personality Inventory-2), which appeared to be valid and showed the presence of anxiety and depression (Tr. 549-59). Dr. Kepes diagnosed Plaintiff with major depressive disorder and panic disorder, assigned a Global Assessment of functioning score of 50, on a scale of 100, and encouraged Plaintiff to enter counseling (Tr. 550). Dr. Kepes also completed a medical source statement regarding Plaintiff's ability to do work-

related mental activities in which he opined that Plaintiff would have extreme restrictions in her ability to carry out instructions and to respond appropriately to supervision and interactions with others (Tr. 560-61).

*2007*

In March 2007, at the request of Plaintiff's attorney, Dr. Kepes wrote a letter in which he noted Plaintiff's treatment history with Dr. Pancner and indicated his opinion that her panic attacks predated July 17, 2006 (Tr. 584). Despite his opinion that Plaintiff had symptoms before that date, Dr. Kepes could not "clearly specify the full extent of how debilitating her panic attacks were" (Tr. 584).

(b) *Back Pain*

*1997*

In October 1997, Plaintiff was rear-ended while stopped at a stop light (Tr. 369). She reported initial discomfort that progressively worsened and she received chiropractic treatment about twice a week through March 1998 (Tr. 369).

*1998*

Plaintiff claimed that, in September 1998, she experienced an episode where she was unable to get out of bed, but subsequently improved with steroids and a muscle relaxant (Tr.

369).

On November 16, 1998, Plaintiff was evaluated by Dr. Steven Cremer for complaints of low back pain radiating into the tops of her hips (Tr. 369). Despite her complaints of severe pain, Plaintiff reported that her only medication was an occasional aspirin (Tr. 368). X-rays showed mild spondylosis, a degenerative osteoarthritis of the joints, at L4 but no other abnormalities (Tr. 369). She exhibited some pain on palpation of her thoracic spine, but her examination was otherwise normal (Tr. 370). Dr. Cremer assessed Plaintiff with severe pain complaints with minimal objective findings (Tr. 370). On November 18, 1998, an MRI of her lumbar spine showed degenerative disc disease at L4-5, a broad disc protrusion, and possible mild nerve root impingement at L5 but no impingement at L4 (Tr. 368). On November 20, 1998, Dr. Cremer noted that Plaintiff had a pre-existing back condition that had been exacerbated by her accident (Tr. 367). He recommended that Plaintiff receive epidural steroid injections and physical therapy (Tr. 367).

*1999*

In January 1999, Plaintiff saw Dr. Ron VanDerNoord for complaints of primarily left sided low back and leg pain (Tr. 364). Dr. VanDerNoord administered epidural steroid injects without complication (Tr. 365). Plaintiff reported significant relief of her symptoms (Tr. 365). Dr. VanDerNoord administered additional injections in March 1999 (Tr. 360-62).

On May 12, 1999, Plaintiff told Dr. Cremer that she only had occasional pain and discomfort and that she took aspirin (Tr. 354). Dr. Cremer indicated that there should not be any specific work restrictions other than no frequent stooping or bending, and that he would see her

on an as-needed basis (Tr. 354). By the end of the month, however, Plaintiff reported increased pain after returning to work (Tr. 351). Dr. Cremer noted that the MRI showed a bulging disc, but that it was fairly small (Tr. 351). He recommended a discogram (Tr. 351).

On July 14, 1999, Dr. VanDerNoord observed significant degenerative changes at L4-5 and mild degenerative changes at L5-S1 (Tr. 344). He noted that despite more pronounced changes at L4-5, Plaintiff's pain appeared to result from her L5-S1 disc (Tr. 344).

On July 16, 1999, Dr. Cremer indicated that Plaintiff was a candidate for intradiscal electrothermic therapy (IDET) (Tr. 338). He opined that she would not be a good candidate for surgery because she was able to function on just occasional Vicodin (Tr. 338). Dr. Cremer specifically noted that Plaintiff was not taking Vicodin on a regular basis (Tr. 328).

In December 1999, Plaintiff underwent the IDET procedure with Dr. VanDerNoord (Tr. 325). On follow-up, she reported that she was 85% better, with only some residual pain in her groin and hip (Tr. 325). Dr. VanDerNoord recommended physical therapy (Tr. 325).


*2000*

By March 2000, Plaintiff completed her physical therapy and reported that she was doing well (Tr. 323). In April 2000, she reported increased pain on the left side of her lower back (Tr. 322). In May 2000, she told Dr. Cremer that she was doing fairly well until the prior week when she developed progressive back pain that radiated into her right leg (Tr. 320). On examination, Dr. Cremer observed that Plaintiff's reflexes and strength were intact, she had slight decreased sensation in the L4-5 distribution, and straight leg-raise testing was negative (Tr. 320). Dr. Cremer recommended home exercise and ice, and prescribed steroids (Tr. 320).

From May 2000 through February 2003, Plaintiff saw Dr. W. David Pepple, a family practitioner, for treatment unrelated to her back pain (Tr. 404-05, 412-13).

*2003*

On May 15, 2003, Plaintiff saw Dr. Shugart for worsening back, shoulder, neck, hips, and leg pain (Tr. 188, 288). She claimed her symptoms were worse when she stood or walked and that she obtained relief by lying on her back (Tr. 188, 288). On examination, her reflexes were normal and she had no motor or sensory deficits (Tr. 189, 289). Dr. Shugart gave her "a few Vicodin" and recommended that she get "into a conservative program" (Tr. 189, 289). An MRI of Plaintiff's lumbar spine showed a small, broad-based central disc protrusion at L4-5 without stenosis, a right paracentral L5-S1 disc protrusion without stenosis, and bilateral narrowing at both levels (Tr. 294–95).

In June 2003, Plaintiff was evaluated by Dr. David Stensland, a pain and physical medicine doctor, on referral from Dr. Pepple (Tr. 288-291). Plaintiff reported deep, throbbing pain, that was worse with standing and walking, and alleviated by lying down (Tr. 288). On examination, she exhibited tenderness with palpation of her lumbosacral junction and a normal range of motion in her back with forward flexion but pain with extension (Tr. 289-290). Her stability and tone were normal and her gait was normal. *Id.* Dr. Stensland recommended facet joint injections and physical therapy, prescribed Vicodin (Tr. 290-91), and subsequently administered a bilateral L5-S1 facet joint injection (Tr. 284-85).

On July 9, 2003, Dr. Isa Canavati conducted a neurosurgical evaluation of Plaintiff (Tr. 468-69). Plaintiff reported constant pain that was aggravated by bending, twisting, and change in

positions (Tr. 468). Dr. Canavati noted that Plaintiff smoked a pack and a half of cigarettes a day (Tr. 468). On examination, Plaintiff exhibited tenderness in the mid-lumbar area, restriction in the flexion and rotation of her spine, and a positive straight leg raise test at eighty degrees (Tr. 469). Dr. Canavati diagnosed Plaintiff with degenerative disc disease and L4-5 and L5-S1 and recommended conservative treatment (Tr. 469).

On July 23, 2003, Dr. Stensland conducted EMG testing, which was normal, and administered an epidural steroid injection at L5-S1 (Tr. 268-69, 272-74). In August 2003, Plaintiff reported that her pain returned following the injection in July (Tr. 264). On examination, Dr. Stensland observed that Plaintiff was in no acute distress, her range of motion was normal, her gait was normal, and she was able to transition from sitting to standing with minimal difficulty (Tr. 264-65). In September 2003, Dr. Stensland administered another epidural steroid injection at L5-S1 (Tr. 260-62). In October 2003, Plaintiff told Dr. Stensland that the Norco brought her pain down to 5 on a scale of 10 (Tr. 253). Dr. Stensland observed that Plaintiff was in no acute distress, her gait was normal, and she was able to transition from sitting to standing without difficulty (Tr. 254). Dr. Stensland reviewed Plaintiff's recent MRI results and indicated that he would like to perform a discogram (Tr. 254).

*2004*

On February 2, 2004, Plaintiff underwent discography of her lumbar spine with Dr. Stensland, which was positive at L5-S1 but negative at L3-4 and L4-5 (Tr. 243-45, 386). Dr. Shugart and Dr. Stensland subsequently told Plaintiff that she was not a candidate for surgery due to the multilevel nature of her degenerative disc disease and because she was a smoker (Tr.

231, 237-38).

In March 2004, Plaintiff told Dr. Stensland that her pain was 5 on a 10-point scale and that she was doing a home exercise program (Tr. 233). On examination, Plaintiff was in no acute distress, she sat with no problem, and her gait was normal (Tr. 233). Dr. Stensland continued Plaintiff's Norco prescription and recommended a course of physical therapy (Tr. 234).

Plaintiff received physical therapy from March 2004 through May 2004 (Tr. 191-217).

On May 13, 2004, Plaintiff told Dr. Stensland that physical therapy had exacerbated her pain and that she decided to discontinue her home exercise program (Tr. 228). She reported her pain as a 4-5 on a 10-point scale (Tr. 228). On examination, Dr. Stensland observed that Plaintiff was in no acute distress, she was able to transition from sitting to standing without difficulty, and her gait was normal (Tr. 228-29). Dr. Stensland noted that Plaintiff was not a candidate for surgery due to her multilevel degenerative disc disease and indicated that he would transfer care back to Dr. Pepple (Tr. 229).

On May 23, 2004, Dr. Shugart indicated that he was unable to comment on Plaintiff's ability to work (Tr. 187).

On May 25, 2004, Barbara C. Gelder, PH.D., conducted a consultative evaluation of Plaintiff (Tr. 218-22). Plaintiff reported that her chief complaints were panic attacks and back pain (Tr. 218-19). On examination, she was oriented, able to engage in abstract reasoning, demonstrated good memory, had a reasonable fund of knowledge, displayed an appropriate mood, was cooperative, and did not demonstrate speech difficulties (Tr. 219-21). Dr. Gelder also observed that Plaintiff did not appear to have any difficulty with mobility (Tr. 221). When asked whether she could do a fairly simple repetitive task for a two-hour period, Plaintiff said she did

not think she could due to her physical problems (Tr. 221). Dr. Gelder diagnosed Plaintiff with generalized anxiety disorder; panic attacks; and alcohol dependence, in remission; and assigned Plaintiff a Global Assessment of Functioning (GAF) score of 51 on a scale of 100 (Tr. 221-22).

On May 26, 2004, Dr. Stensland wrote that Plaintiff had been treated conservatively, she was at a stable baseline, and that he was unable to comment on her ability to perform work-related activities (Tr. 224-25).

In June 2004, Dr. H.M. Bacchus, Jr., conducted a consultative examination of Plaintiff (Tr. 377-380). Plaintiff reported chronic lower back pain with aches and weakness in her legs (Tr. 377). She claimed that her symptoms were exacerbated with standing and walking, bending, lifting, climbing, twisting, and turning (Tr. 377). She reported that, with Norco, her pain was 4-5 on a 10-point scale (Tr. 377). Plaintiff also told Dr. Bacchus that she had 2-3 panic attacks per month (Tr. 377). X-rays of Plaintiff's lumbar spine showed normal alignment and mild degeneration at L4-5 (Tr. 378). On examination, Plaintiff was in no acute distress, she was able to transition between sitting and standing slowly, her gait was normal, she exhibited limitations in her range of motion in her lower back and knees, and neurological testing was normal (Tr. 378, 380). Dr. Bacchus opined that Plaintiff retained the physical functional capacity to perform general full-time duties, including lifting 15 to 25 pounds (Tr. 379).

On July 13, 2004, Dr. R. Fife, a reviewing physician with the state agency, opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds; stand, walk, or sit about six hours in an eight-hour day; engage in unlimited pushing or pulling; and engage in frequent postural activities (Tr. 34, 428-34).

On September 16, 2004, Dr. B. Whitley, a reviewing physician with the state agency,

affirmed Dr. Fife's opinion, except that he found that Plaintiff could only engage in occasional postural activities with no climbing of ladders, ropes, or scaffolds (Tr. 33, 428-34)j. Dr. Whitley also opined that Plaintiff should avoid concentrated exposure to extreme cold, heat, wetness, vibration, slippery surfaces, and hazardous machinery or heights (Tr. 432).

On September 17, 2004, J. Pressner, Ph.D., a reviewing psychologist with the state agency, affirmed Dr. Pressner's assessment as written (Tr. 436).

*2005*

On January 4, 2005, Plaintiff told Dr. Pepple that she had continued back pain and was "uncomfortable all the time" (Tr. 513). Plaintiff asked to be evaluated to make sure there was no new damage (Tr. 513).

On January 12, 2005, an MRI of Plaintiff's cervical spine revealed normal alignment, spondylosis (degenerative osteoarthritis of vertebral joints or neural foraminae) from C4 through C7, and a disc bulge at C6-7 without cord compression or abnormal cord signal (Tr. 467). An MRI of her lumbar spine showed a small central disc protrusion at L4-5, with borderline impingement of the nerve root, a small broad-based disc protrusion at L5-S1 which contacted but did not displace the nerve root (Tr. 465-66).

On January 25, 2005, Dr. Canavati reviewed the MRI results, noting that they showed only mild changes, and recommended continued conservative treatment (Tr. 461). Dr. Canavati also recommended a physical medicine and rehabilitation consultation (Tr. 461).

In February 2005, Plaintiff saw Dr. Frank Lutz, a physical medicine and rehabilitation specialist (Tr. 456-59). On examination, Plaintiff's reflexes were normal, neurological testing

was normal, her sensation was normal, range of motion in her spine was limited at eighty degrees, and straight leg raise testing was positive (Tr. 457-58). Dr. Lutz assessed Plaintiff with cervical spondylosis based on her MRI results, degenerative disc disease at L4-5 and L5-S1, and a myofascial pain syndrome (Tr. 458). He recommended trigger point injections and a rheumatology consultation (Tr. 458).

In April, 2005, Plaintiff was evaluated by Dr. Karen Ringwald, a rhuematologist (Tr. 483-86). In May 2005, Dr. Ringwald indicated that there was no concern that Plaintiff had a true inflammatory disease or connective tissue disorder and instead assessed her with firbomyalgia (Tr. 477). Plaintiff refused physical therapy, but indicated that she would be willing to try some mild muscle relaxants and antidepressants (Tr. 477).

On December 21, 2005, an MRI of Plaintiff's pelvis showed a right central disc protrusion at L5-S1 slightly displaced the right S1 nerve root (Tr. 516). It was noted that the protrusion was unchanged from the January 2005 study (Tr. 516).

*2006*

On May 3, 2006, Plaintiff was evaluated by Dr. Madhav Bhat (Tr. 535-37). On examination, neurological testing was normal, reflexes were normal, and Plaintiff walked well (Tr. 536). Dr. Bhat indicated that, due to the nature of her pain, fibromyalgia was a consideration (Tr. 536). On June 21, 2006, Dr. Bhat reviewed her MRI results, noting that she had mild degenerative changes in her cervical spine (Tr. 524). Neurological testing was normal, an EMG of Plaintiff's right arm was normal, and Plaintiff walked normally (Tr. 525, 528-529).

X-rays taken on June 29, 2006, showed mild spondylosis at L3-4 and L4-5 with normal

alignment and no spondylolisthesis (the anterior displacement of a vertebra in relation to the vertebra below). (Tr. 545).

In August 2006, Plaintiff was evaluated by Dr. Gregory Hoffman, an orthopedic surgeon (Tr. 566-67). Dr. Hoffman noted that MRIs and X-rays showed mild to moderate degenerative disc disease at L5-S1 and L4-5 (Tr. 545, 567, 568-69). Neurological testing was normal, Plaintiff exhibited a normal range of motion of her joints, and straight leg raise testing was normal (Tr. 567). Dr. Hoffman told Plaintiff that she did "not have anything that required surgical intervention" (Tr. 567).

**(3)** *Plaintiff's Hearings*

*(a) Plaintiff's Testimony*

Plaintiff testified that she experienced disabling pain in her back and neck, and numbness and tingling in her feet (Tr. 604-05, 631-32). She stated that her symptoms were exacerbated by "walking or sitting" (Tr. 631-32). She claimed that she woke up two to three times per night (Tr. 632).

Plaintiff testified that she had panic attacks since she was in high school and that nothing worked to alleviate them except for drinking alcohol (Tr. 598-99, 602-03, 627-28). She stopped drinking in January 2002, following an ultimatum from her boyfriend (Tr. 612, 628-30). She claimed that, as a result of her panic attacks, she avoided responsibilities (Tr. 603, 630-31). She stated that in 2001, she started having daily panic attacks (Tr. 597). She testified that she coped with anxiety by staying at home (Tr. 630).

Plaintiff claimed that, on a typical day, she got up with her daughter to see her off to school and then went back to bed, but made sure she was up by the time her daughter got home from school (Tr. 606-07). She stated that she went to the grocery store once a week and sometimes took her daughter to help with lifting items (Tr. 603, 630).

(b) *Vocational Expert's Testimony*

Robert Bond testified as a neutral vocational expert at the January 2007 administrative hearing (Tr. 619-20). He testified that Plaintiff's past work as secretary (receptionist and deputy clerk) was performed at the sedentary level and that Plaintiff would be able to perform such work (Tr. 619-20). If her testimony was considered credible, however, the vocational expert testified that she would not be able to perform such past work (Tr. 620).

**(4) *ALJ's First Decision***

The ALJ concluded that Plaintiff was not disabled before July 17, 2006, but became disabled on that date and has continued to be disabled through the date of the decision. (DE 1-2 at 4.) ALJ also concluded that because Plaintiff was not disabled on or before the date last insured, she is not entitled to Title II Benefits, but that she is eligible for Supplemental Security Income payments commencing on July 17, 2006. (*Id.* at 4-5.)

The ALJ found that Plaintiff's back pain limits how much she can lift. (*Id.* at 6.) It also limited her ability to stand or walk for more than two hours per eight-hour day. (*Id.* at 4.) However, she had no limitations of manipulation or sitting, and her accounts of her activities of daily living indicate the ability to engage in sedentary exertion and to sit for six hours per eight-

hour day. (*Id.*) ALJ also noted that she had not suffered the loss of muscle strength, reflexes, sensation, and positive leg-raising signs necessary to meet any of the musculoskeletal impairment requirements. (*Id.*) The ALJ believed that Plaintiff has exaggerated her problems, basing that conclusion on tests that showed she continued to have normal strength reflexes, along with sensation in her lower extremities. (*Id.* at 5.) ALJ acknowledged Plaintiff's disc disease, but also noted that she had no herniated discs, and that neurological findings were normal in all extremities. (*Id.*) Along with several other normal test results, ALJ noted Plaintiff's "spotty work history" over the previous fifteen years, and felt that this did not improve her credibility or show a dedication to working. (*Id.*)

The ALJ also found that Plaintiff's anxiety disorder and panic attacks were not severe impairments from the alleged onset date of August 23, 2001, until July 17, 2006. (*Id.* at 4.) During that time, Plaintiff had no restrictions of activities of daily living, including cleaning, caring for her daughter, handling her own money, and cooking, among other activities. (*Id.*) She elected to discontinue use of Paxil and Zoloft, two psychotropic medications prescribed by her family physician for anxiety. (*Id.*) Plaintiff did not seek mental health treatment from a mental health specialist during the time period. (*Id.*) The ALJ acknowledged that Plaintiff had "mild difficulty" maintaining social functioning before July 17, 2006, but found that she did not meet the criteria for anxiety disorders during the period because she was able to function independently outside the area of her home. (*Id.*) Her panic attacks were not triggered by being around other people, and she was able to leave home to see family and friends, play pool with her boyfriend, and attend her daughter's soccer games. (*Id.*) She also had no more than mild difficulty related to concentration, persistence, or pace during the time period. (*Id.*) ALJ found

that Plaintiff did not have more than minimal mental limits before July 17, 2006. (*Id.* at 6.)

Beginning on July 17, 2006, the ALJ found Plaintiff's allegations regarding her symptoms and limitations, as related to her anxiety disorder and panic attacks, were generally credible. (*Id.* at 7.) ALJ based that finding on Plaintiff's psychological testing results on that date. (*Id.*) Beginning then, the ALJ found, Plaintiff's disorders had become severe impairments that imposed additional limits on her residual functional capacity. (*Id.*) The impairments limit her ability to tolerate frequent contact with others, and her ability to handle detailed or complex instructions and information. (*Id.*) ALJ noted that a vocational expert testified that a person with Plaintiff's additional mental limitations which began on July 17, 2006, could not perform her past work as a receptionist. (*Id.*) Vocational expert also testified that an individual of Plaintiff's age, education, work experience, and residual functional capacity would have been unable to perform the requirements of work existing in significant numbers in the national economy. (*Id.*)

**(4)** *Appeals Council Hearing*

At the hearing, Plaintiff again amended her onset date of disability to October 15, 2002. (DE 1-2 at 29.)

The Appeals Council affirmed the ALJ's finding that Plaintiff had been disabled as of July 17, 2006. (*Id.* at 28.) However, the Council directed the ALJ to address again Plaintiff's allegation of disability before that date. (*Id.*) The ALJ was instructed to obtain additional medical evidence "to clarify the nature and severity of the claimant's impairment," to further consider Plaintiff's residual functional capacity, to obtain further testimony from a vocational expert, to offer Plaintiff the opportunity for a new administrative hearing, to take any action needed to

complete the administrative record, and to issue a new decision. (*Id.*)

## (5) *ALJ's Second Decision*

Between the time of ALJ's first decision and the second decision, psychologist Dr. Sherwin Kepes wrote a letter in which he stated with "absolute certainty" that Plaintiff's diagnoses for panic attacks and an anxiety disorder predated July 17, 2006. (DE 1-2 at 18.) However, ALJ found this consistent with his finding in the first decision that the panic attacks were not severe enough to impair Plaintiff from working. (*Id.* at 33.) Although Plaintiff's attorney argued that it was "unlikely that such extreme limitations occurred suddenly at the time of her examination on July 17, 2006," ALJ decided that there is no medical evidence or opinion which shows such limitations are unlikely to occur suddenly. (*Id.*)

ALJ recognized degenerative disc disease in Plaintiff's cervical and lumbar spine, but determined that there was "no significant nerve root compression" as required. (*Id.* at 34.) Nor is there evidence of other spinal conditions required by the listings. ALJ used a two-step process, first determining whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain. (*Id.* at 34-35.) After considering the evidence in the record, the ALJ found that Plaintiff's medically determinable impairments could reasonably have been expected to produce the alleged symptoms. (*Id.* at 35.) The ALJ then moved onto the second step, which was to evaluate the intensity, persistence, or functionally limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's ability to do basic work activities. (*Id.*) ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible

before July 17, 2006, and that they were inconsistent with the residual functional capacity assessment. (*Id.*) Although ALJ acknowledged that Plaintiff said she was "in extreme pain every day" at one point in 2004, he noted that this statement was inconsistent with most self-assessments during the time period which placed her pain level well below that level, usually from 4 to 5 on a 10-point scale. (*Id.*)

**B. Standard of Review**

The Social Security Act authorizes judicial review of final decisions made by the Social Security Agency. 42 U.S.C. § 405(g). Upon judicial review, the court will only consider whether the ALJ's findings are supported by substantial evidence and made under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In issuing his opinion, the ALJ must, at minimum, state his analysis of the evidence so a reviewing court can make an accurate decision. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Although an ALJ is not required to address all the evidence, "the ALJ's analysis must provide some glimpses into the reasoning behind [the] decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). In determining whether the ALJ has satisfied this burden, the court will not re-weigh evidence or make decisions of credibility. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

**C. Disability Standard**

To qualify for Disability Insurance Benefits the claimant must establish that he or she suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or qual to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski*, 245 F.3d at 886. A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**D. Discussion**

Plaintiff raises several issues on review, related to both back pain and her panic attack/anxiety disorder. First, Plaintiff argues that the ALJ has mistaken the dates of her degenerative disc diagnosis. (DE 20 at 2.) Second, Plaintiff argues that the ALJ was mistaken

when he stated that she had neither nerve root compression nor herniated discs. (*Id.* at 3.) Third, Plaintiff argues that the ALJ was mistaken in questioning the credibility of her statement to a physician that she was "in extreme pain every day." (*Id.* at 3-4.) Fourth, Plaintiff argues that the ALJ made a mistake by not distinguishing between her panic attacks, which occurred intermittently, and her generalized anxiety disorder, which she describes as "ever present." (*Id.* at 5.) Finally, Plaintiff argues that the ALJ ordered the exam by Dr. Sherwin Kepes, then chose to dismiss the portions of the exam that were in her favor. (*Id.* at 5.) Plaintiff argues that this constituted an "abuse of discretion" by the ALJ. (*Id.*)

### (1) *Dates of Diagnosis*

Plaintiff points to the ALJ's following analysis of her back condition: "After the amended alleged onset date of disability, the claimant has had the following severe impairment: degenerative disc disease (cervical and lumbar)." (*Id.* at 2.) That sentence alleges Plaintiff, indicates that he has "mistaken the dates of medical evidence diagnosing degenerative disc disease." (*Id.*) Plaintiff, however, misinterprets the ALJ's assessment, which is clarified by reading further into the decision. Although the ALJ characterizes Plaintiff's impairment as "severe" following the alleged onset date of disability, it does not follow that the ALJ found the degenerative disc condition to be nonexistent before that date. (DE 1-2 at 31.) In fact, the ALJ acknowledged in his decision that "there is evidence of degenerative disc disease in the cervical and lumbar spine." However, ALJ refers to an MRI report that characterizes the degenerative changes as "mild," requiring "conservative treatment." Medical evidence of degenerative disc disease before the alleged onset date of disability is not inconsistent with the ALJ's

22

determination that the impairment was not severe until after July 17, 2006.

**(2)** *Mistaken Diagnosis*

Plaintiff argues that the ALJ finds that she had no nerve root compression, when her records indicate otherwise. (DE 20 at 2.) On February 8, 2005, Dr. David J. Lutz noted after a visit with Plaintiff that she suffered from borderline impingement on the left L4 nerve root (Tr. 458). This diagnosis is not inconsistent with the ALJ's actual finding, which was that there is "no significant nerve root compression." (DE 1-2 at 34.) The ALJ did not overlook the existence of the condition. He found that related symptoms were minimal, and not "significant" enough to hinder her ability to perform work. (*Id.*)

**(3)** *Credibility of Plaintiff's "Extreme Pain"*

Plaintiff argues that the ALJ took out of context her statements regarding the level of back pain she was suffering following the alleged onset date of disability. (DE 20 at 2-3.) By taking a wider look at the record, Plaintiff argues, ALJ should have taken into account her spotty work history, years of doctor visits, physical therapy, and counseling appointments and concluded that the "extreme pain" statement was consistent with the overall record. (*Id.* at 3.) The ALJ, on the other hand, based his conclusion regarding Plaintiff's credibility on pain assessment tests in which Plaintiff typically estimated her pain level at 4 to 5 on a ten-point scale, and often even lower when she was using pain medication. (DE 1-2 at 35.) Even if Plaintiff's criticism of ALJ's weighing of the evidence has merit, that is not a matter for this court to determine. According to the standard of review used at this stage of the process, the

court is not to re-weigh evidence or make decisions of credibility. *Boiles*, 395 F.3d at 425 (7th Cir. 2005). Re-examining the ALJ's judgment as to which statements and events should receive more or less weight, where the intensity of Plaintiff's pain is concerned, would require this court to do both of those things. Most importantly, ALJ's decision is supported by substantial evidence in the record.

### (4) *Panic Attacks vs. Generalized Anxiety*

Plaintiff argues that the "trained and experienced" ALJ should have recognized, but did not do so, that there is a difference between panic attacks, which occur occasionally, and "ever-present . . . anxiety." (DE 20 at 4.) However, ALJ did recognize this distinction. In his second decision, the ALJ recognizes that psychologist Barbara C. Gelder, Ph.D., believed that Plaintiff was suffering from generalized anxiety disorder. (DE 1-2 at 31.) However, "these were not said to interfere with her activities of daily living." (*Id.*) Re-consideration of the role that Plaintiff's generalized anxiety played in her alleged disability would therefore require this court to re-weigh the evidence that the ALJ has already considered, an action outside the limits of the reviewing court. Again, substantial evidence supports ALJ's findings.

### (5) *ALJ 'Ignored' Doctor's Testimony*

The ALJ did not "dismiss" evidence in Plaintiff's favor included in the report by Dr. Sherwin Kepes. Rather, the ALJ found that "there is no medical evidence or opinion . . . which shows such limitations are unlikely to occur suddenly." (DE 1-2 at 33-34.) In his discretion, the ALJ made a determination of how much weight to give the opinion of Dr. Kepes. This court is

not to re-weigh such determinations when reviewing the evidence.

**E. Conclusion**

  The ALJ built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. All the issues raised in Plaintiff's complaint would require this reviewing Court to either re-weigh the evidence or re-assess judgments of credibility, both duties being the exclusive province of the ALJ. Therefore, the Court AFFIRMS the ALJ's decision.

  SO ORDERED on August 18, 2010.

         _S/ Joseph S. Van Bokkelen_____
         JOSEPH S. VAN BOKKELEN
         UNITED STATES DISTRICT JUDGE